## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| CIJI SANCHEZ, WENDY RODRIGUEZ, OLGA OTKINA, LAREINA GREEN, AMANDA MURRAY, STEPHANIE MAYA, KATHERINE VESCOVO, DENA HABBOUSH, and CARMUSE MITCHEM, individually and on behalf of all others similarly situated, | Case No. **CLASS ACTION COMPLAINT** **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| THE PROCTER & GAMBLE COMPANY, | |
| Defendant. | |

Plaintiffs Ciji Sanchez, Olga Otkina, LaReina Green, Amanda Murray, Stephanie Maya, Katherine Vescovo, Dena Habboush, and Carmuse Mitchem ("Plaintiffs"), individually and on behalf of all others similarly situated, by their attorneys, bring this class action against The Procter & Gamble Company ("Defendant") and allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge:

### NATURE OF THE ACTION

1.      This action seeks to remedy Defendant's deceptive and misleading business practices regarding the false, misleading, and deceptive marketing and sale of Defendant's Tampax products throughout the United States ("Products"[1]). Defendant's Products include the following:

     a.      Tampax Pearl Ultra Tampons;

     b.      Tampax Pearl Super Tampons;

     c.      Tampax Pearl Super Plus Tampons; and

---

[1] The specific products that each named Plaintiff purchased are listed below, including in the table at ¶ 55 and the Plaintiffs Factual Allegations section at ¶ 132 *et seq.*

        d.      Tampax Pearl Regular Tampons.

2.     Throughout the class period on the Product labels, which is where every consumer looks for information in deciding whether to purchase (or not) a product, Defendant states that the products are:

        a.      The "U.S. GYNECOLOGIST RECOMMENDED TAMPON BRAND";

        b.      "FREE OF PERFUME";

        c.      "FREE OF ELEMENTAL CHLORINE BLEACHING';

        d.      "TAMPON FREE DYES";

        e.      "CLINICALLY TESTED GENTLE TO SKIN"; and

        f.      "MADE WITH CARE SINCE 1936".

3.     Defendant improperly, deceptively, and misleadingly labeled and marketed their Products to reasonable consumers, like Plaintiffs, by omitting and not disclosing to consumers on their packaging that the Products are contaminated with or at the risk of being contaminated with unsafe levels of lead, which is a powerful neurotoxin that is known to cause, *inter alia*, cognitive deficits, mental illness, dementia, and hypertension.

4.     Defendant knew or should have known that the Products contain lead.

5.     Plaintiffs' independent testing confirmed that Defendant's Products contain lead in the portion of the tampon that is inserted vaginally and contacts the skin.

6.     The lead contained in the Products is particularly concerning to consumers because the Products are intended to come in direct contact with the vaginal walls and the cervix, which is the lower part of the uterus that sits at the top of the vagina. As a result, the lead in the products can directly enter the bloodstream.

7.     Risks of exposure to toxins through vaginal absorption are elevated compared to oral exposure because the toxins are not metabolized or filtered by the liver and can directly enter the bloodstream.

8.     Ordinary and intended use of the Products exposed and continue to expose consumers to unsafe levels of lead.

9.     Plaintiffs and those similarly situated ("Class") reasonably and implicitly trust manufacturers such as Defendant to sell health and hygiene products that are safe and free from harmful contaminants, including lead.

10.     Plaintiffs and Class members expect that the health and hygiene products they purchase to put inside their bodies will not contain, or risk containing, any knowingly harmful substances that cause injury. If such substances are contained in, or risk being contained in, the health and hygiene products sold by a manufacturer like Defendant, reasonable consumers like Plaintiffs expect that this will be disclosed on the products' packaging so that they can have full and fair information to decide for themselves whether they want to purchase and use the product.

11.     Reasonable consumers lack the scientific knowledge necessary to determine whether the Products do in fact contain (or have a risk of containing) lead, or to ascertain the true nature of the quality of the Products. As such, reasonable consumers must and do rely on manufacturers like Defendants to be transparent and to properly disclose on the packaging all material information regarding the Products, their safety and health risks.

12.     Plaintiffs and Class members had no prior knowledge that the Products they purchased contained lead or had a risk of containing lead.

13.     Plaintiffs and Class members would not have purchased the Products if they had known they would be inserting or would be at risk of inserting a product containing lead into their bodies.

14.     Consumers have been deprived of making the informed choice between the Products, which contain lead or were at risk of containing lead, and other menstrual products, which do not.

15.     Plaintiffs and Class members have suffered injury by purchasing the Products that they would not have purchased if they knew that the Products contained lead or were at risk of containing lead.

16.     Plaintiffs and Class members paid a premium for the Products based upon Defendant's marketing and advertising campaign. Given that Plaintiffs and Class members paid a premium for the Products based on Defendant's misrepresentations and omissions, Plaintiffs and Class members suffered an injury in the amount of the premium paid.

17.     Plaintiffs bring this action against Defendants on behalf of themselves and Class members who purchased the Products during the applicable statute of limitations period ("Class Period").

## JURISDICTION AND VENUE

18.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 Members in the proposed class; (2) Members of the proposed class have a different citizenship than the Defendant; and (3) the claims of the proposed Class members exceed $5,000,000 in the aggregate.

19.     The Court has personal jurisdiction over Defendant because Defendant is headquartered in Cincinnati, Ohio. Defendant's contacts with this forum are continuous and

substantial. Defendant intentionally availed itself of the markets within Ohio through the sale and distribution of the Products in Ohio and through the privilege of conducting business in Ohio.

20.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendant engages in continuous and systematic business activities within the State of Ohio and is headquartered in Ohio. Moreover, a substantial part of the events and conduct giving rise to the claims alleged herein occurred in this district.

## PARTIES

### I. Plaintiffs

21.     Plaintiff Ciji Sanchez is, and at all relevant times was, a citizen and resident of California.

22.     Plaintiff Wendy Rodriguez is, and at all relevant times was, a citizen and resident of Florida.

23.     Plaintiff Olga Otkina is, and at all relevant times was, a citizen and resident of Illinois.

24.     Plaintiff LaReina Green is, and at all relevant times was, a citizen and resident of Maryland.

25.     Plaintiff Amanda Murray is, and at all relevant times was, a citizen and resident of Massachusetts.

26.     Plaintiff Stephanie Maya is, and at all relevant times was, a citizen and resident of Michigan.

27.     Plaintiff Katherine Vescovo is, and at all relevant times was, a citizen and resident of Missouri.

28.     Plaintiff Dena Habboush is, and at all relevant times was, a citizen and resident of New Jersey.

29.     Plaintiff Carmuse Mitchem is, and at all relevant times was, a citizen and resident of New York.

**II. Defendant**

30.     Defendant The Procter & Gamble Company is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

## <u>COMMON FACTUAL ALLEGATIONS</u>

**I. Lead is extremely harmful**

31.     Lead is a toxic heavy metal. The scientific consensus is that there is no level of lead that is safe for human exposure.

32.     According to the Mayo Clinic, "[l]ead poisoning occurs when lead builds up in the body, often over months or years. Even small amounts of lead can cause serious health problems."[2]

33.     According to The World Health Organization, "there is no level of exposure to lead that is known to be without harmful effects."[3]

34.     The World Health Organization warns that "[t]here is no level of exposure to lead that is known to be without harmful effects"[4] and that "[e]xposure to lead can affect multiple body systems and is particularly harmful to young children and women of childbearing child-bearing age."[5]

---

[2] https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717
[3] https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health
[4] World Health Organization, *Lead Poisoning* (Sept. 27, 2024), https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.
[5] https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health

35.     The U.S. Centers for Disease Control and Prevention cautions that "[e]ven low levels of lead in blood have been shown to have an effect."[6]

36.     At very high levels, lead poisoning can be fatal."[7]

37.     Lead affects almost every organ and system in the body and accumulates in the body over time, causing severe toxicity, including inhibiting neurological function, anemia, kidney damage, seizures, and even death.

38.     Lead exposure has been shown to reduce intelligence, and to increase the risk of mental illness, dementia, hypertension, arrhythmia, and breast cancer.[8]

39.     Peer-reviewed scientific research justifies Plaintiffs and Class members heightened concern "not only given the known adverse effects of metal exposure on health but also the characteristics of the vaginal epithelium that allow for efficient chemical absorption into systematic circulation."[9]

40.     Vaginal walls are permeable and allow for efficient absorption of materials, vaginal administration bypasses the systemic veins that transport blood through the digestive tract to the liver, and metabolic functions would not filter lead that could be directly absorbed into the bloodstream.[10]

---

[6] U.S. Centers for Disease Control, CDC Updates Blood Lead Reference Value (Apr. 2, 2024), https://www.cdc.gov/lead-prevention/php/news-features/updates-blood-lead-reference-value.html#cdc_generic_section_3-effects-on-lead-in-the-blood.

[7] https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717

[8] Maryse F. Bouchard, PhD et al., *Blood Lead Levels and Major Depressive Disorder, Panic Disorder, and Generalized Anxiety Disorder in US Young Adults*, 66 ARCHIVES OF GENERAL PSYCHIATRY 1313, 1317 (Dec 2009); Marc G. Weisskopf et al., *Cumulative Lead Exposure and Prospective Change in Cognition Among Elderly Men*, 160 AMERICAN JOURNAL OF EPIDEMIOLOGY 1184, 1185, 1188, 1190-91 (2004); Olusegun I. Alatise, Gerhard N. Schrauzer, *Lead Exposure: A Contributing Cause of the Current Breast Cancer Epidemic in Nigerian Women*, BIOLOGICAL TRACE ELEMENT RESEARCH 127, 138 (Mar. 3, 2010).

[9] Shearston et al., *Tampons as a source of exposure to metal(loids)*, 190 Env't Int'l (2024), 2, https://www.sciencedirect.com/science/article/pii/S0160412024004355.

[10] Shearston et al., *Tampons as a source of exposure to metal(loids)*, 190 Env't Int'l (2024), 2, https://www.sciencedirect.com/science/article/pii/S0160412024004355.

41. The lead contained in the Products is particularly concerning to the human health of the consumers utilizing the Products because the products are not consumed orally, but rather inserted vaginally where the lead can be directly absorbed into the blood stream.

42. Since it in inserted vaginally, there is no "first-pass metabolism and detoxification via the liver" but instead the lead in the Products may "directly enter systemic circulation."[11]

43. The "first pass effect" for oral administration refers to the "drug metabolism whereby the drug concentration is significantly diminished before it reaches the systemic circulation, often due to the metabolism in the liver."[12] On the other hand, vaginal administration directly accesses the networks of blood vessels that surround vital organs, including the pelvic organs.[13]Vaginal walls are permeable and allow for efficient absorption, including in absorption tests of certain medications.[14] As a result, Toxins can pass through the vaginal epithelium and enter systemic circulation.[15]

44. A study published in August 2023 titled Medication Routes of Administration, details thorough research and findings on the various bodily locations absorption and permeability efficacy regarding medication absorption and overall permeable efficacy into systemic circulation.[16] Moreover, the study highlights that the vaginal route "has the advantage of bypassing the first-pass effect" meaning that the vaginal route inherently has an absorption factor greater than other bodily areas due to its ability to bypass metabolism through the liver and directly into systemic

---

[11] Environmental International 190 (2024) 108849, Tampons as a source of exposure to metal(loid)s, Jenni A. Shearson, et al. (citing Kim and De Jesus, 2022).
[12] Kim J, De Jesus O, Medication Routes of Administration, EUROPE PMC (March 2021), available at https://europepmc.org/article/NBK/nbk568677.
[13] Id.
[14] Environmental International 190 (2024) 108849, Tampons as a source of exposure to metal(loid)s, Jenni A. Shearson, et al. (citing Kim and De Jesus, 2022) (citing Patel et al., 1983; Vorontsova et al., 2022).
[15] Environmental International (discussing the toxic shock syndrome outbreak of the 1980s) (citations omitted).
[16] https://www.ncbi.nlm.nih.gov/books/NBK568677/

8

circulation.[17] As a result, the liver is unable to safely filter toxins such as Lead through its metabolic function.

45. Additionally, a 2011 published review study titled *The Vagina As A Route For Drug Delivery* concluded that the vagina has hire absorption efficacy when compared to oral absorption "because it allows the use of lower doses, maintains steady drug administration levels, and requires less frequent administration than the oral route." [18]

46. Given all of this, lead is especially dangerous when present in the Products because if the lead in the Products passes through the vaginal epithelium, it is not diminished or filtered by metabolic function, but rather can be absorbed directly into the bloodstream.

## II. Lead is present in Defendant's Products

47. Recently published independent scientific research has just revealed that lead is present in tampons. In August 2024, researchers analyzed sixty tampon samples, representing 30 tampons among 24 brand-product lines.[19]

48. The results evidenced significantly elevated mean concentrations of lead (geometric mean [GM] = 120 ng/g) in the tested products.

49. After reviewing the August 2024 study, Plaintiffs (through counsel) conducted independent testing of the products by an established laboratory specializing in chemical analysis of consumer products with methods successfully implanted for over 30 years. Lead analysis of the tampons was conducted by the lab using a specialized version of the EPA 200.8 method with a technique called Ion Coupled Plasma Mass Spectrometry ("ICP-MS').

---

[17] *Id.*
[18] https://pubmed.ncbi.nlm.nih.gov/23229421/
[19] Shearston et al., *Tampons as a source of exposure to metal(loids)*, 190 Env't Int'l (2024), 2, https://www.sciencedirect.com/science/article/pii/S0160412024004355 (last visited October 28, 2025).

50.     The test method is well-recognized and accepted with the scientific community due to its high precision and sensitivity in measuring heavy metals, including lead.

51.     The investigators and scientist who conducted the study discussed in the Environmental International Article, which tested tampons for heavy metals (discussed and cited throughout the complaint), used ICP-MS to determine the concentrations and levels of heavy metals in the tampons.

52.     The FDA validated ICP-MS and it is the approved methodology used by the FDA to test for the presence of heavy metals in food.[20]

53.     The testing of homogenous samples of Defendants' products verified the presence of lead in the portion of the tampon that is inserted vaginally. The chart below summarized the results:

| Product | Lead Content |
|---|---|
| Tampax Pearl Ultra Tampons | 0.196 ppm |
| Tampax Pearl Super Tampons | 0.235 ppm |
| Tampax Pearl Super Plus Tampons | 0.239 ppm |
| Tampax Pearl Regular Tampons | 0.150 ppm |

54.     This testing is scientifically rigorous and valid. It was conducted by an independent, accredited testing laboratory. ICP-MS is recognized for its high precision and sensitivity in measuring lead content. The *Shearston* study also used ICPMS testing.

55.     Beyond this general testing, Plaintiffs (through counsel) also conducted the same ICP-MS testing on leftover Products specifically from Plaintiff's own packages of tampons they each purchased. Those test results are as follows:

| Plaintiff | Sample Number | Sample Description | Lead Content |
|---|---|---|---|
| Ciji Sanchez (CA) | 25350a | Tampax Tampon (R) -1 | 0.157 ppm |

---

[20] *See, e.g.*, https://www.fda.gov/food/environmental-contaminants-food/lead-food-andfoodwares (linking to an Elemental Analysis Manual for Inductively Coupled Plasma-Mass Spectrometric Determination)

| | | | |
|---|---|---|---|
| | 25350b | Tampax Tampon (R) -2 | 0.145 ppm |
| | 25350c | Tampax Tampon (R) -3 | 0.160 ppm |
| | 25350d | Tampax Tampon (R) -4 | 0.139 ppm |
| | 25350e | Tampax Tampon (R) -5 | 0.151 ppm |
| | 25350f | Tampax Tampon (R) -6 | 0.150 ppm |
| | 25350g | Tampax Tampon (R) -7 | 0.153 ppm |
| | 25350h | Tampax Tampon (S) -1 | 0.222 ppm |
| | 25350i | Tampax Tampon (S) -2 | 0.136 ppm |
| | 25350j | Tampax Tampon (S) -3 | 0.146 ppm |
| Olga Otkina (IL) | 25328BU | Tampax (R) | 0.187 ppm |
| | 25328BV | Tampax (R) | 0.145 ppm |
| | 25328BW | Tampax (R) | 0.165 ppm |
| | 25328BX | Tampax (R) | 0.133 ppm |
| | 25328BY | Tampax (R) | 0.190 ppm |
| | 25328BZ | Tampax (L) | 0.126 ppm |
| | 25328CA | Tampax (L) | 0.129 ppm |
| | 25328CB | Tampax (L) | 0.126 ppm |
| | 25328CC | Tampax (S) | 0.155 ppm |
| | 25328CD | Tampax (S) | 0.154 ppm |
| Wendy Rodriguez (FL) | 25328AI | Tampax (R) | 0.222 ppm |
| 2406884 | 25328AJ | Tampax (R) | 0.187 ppm |
| | 25328AK | Tampax (R) | 0.216 ppm |
| | 25328AL | Tampax (R) | 0.203 ppm |
| | 25328AM | Tampax (R) | 0.200 ppm |
| | 25328AN | Tampax (R) | 0.157 ppm |
| | 25328AO | Tampax (R) | 0.203 ppm |
| | 25328AP | Tampax (R) | 0.157 ppm |
| | 25328AQ | Tampax (R) | 0.173 ppm |
| | 25328AR | Tampax (R) | 0.219 ppm |
| | 25328AS | Tampax (R) | 0.191 ppm |
| | 25328AT | Tampax (R) | 0.189 ppm |
| | 25328AU | Tampax (R) | 0.220 ppm |
| | 25328AV | Tampax (R) | 0.175 ppm |
| | 25328AW | Tampax (R) | 0.167 ppm |
| | 25328AX | Tampax (R) | 0.178 ppm |
| | 25328AY | Tampax (R) | 0.182 ppm |
| | 25328AZ | Tampax (R) | 0.178 ppm |
| | 25328BA | Tampax (R) | 0.233 ppm |
| | 25328BB | Tampax (R) | 0.235 ppm |
| | 25328BC | Tampax (R) | 0.241 ppm |
| | 25328BD | Tampax (R) | 0.230 ppm |

| | | | |
|---|---|---|---|
| | 25328BE | Tampax (R) | 0.218 ppm |
| | 25328BF | Tampax (R) | 0.228 ppm |
| | 25328BG | Tampax (R) | 0.258 ppm |
| | 25328BH | Tampax (R) | 0.221 ppm |
| | 25328BI | Tampax (R) | 0.167 ppm |
| | 25328BJ | Tampax (L) | 0.193 ppm |
| | 25328BK | Tampax (L) | 0.145 ppm |
| | 25328BL | Tampax (L) | 0.160 ppm |
| | 25328BM | Tampax (S) | 0.155 ppm |
| | 25328BN | Tampax (S) | 0.209 ppm |
| | 25328BO | Tampax (S) | 0.174 ppm |
| | 25328BP | Tampax (S) | 0.144 ppm |
| | 25328BQ | Tampax (S) | 0.123 ppm |
| | 25328BR | Tampax (S) | 0.158 ppm |
| | 25328BS | Tampax (S) | 0.120 ppm |
| | 25328BT | Tampax (R) | 0.189 ppm |
| LaReina Green (MD) | 25211a | Tampax/ "U"/ Sample 1/ with colorful picture | 0.346 ppm |
| | 25211g | Tampax/ Radiant/ Regular/ Sample 1 | 0.156 ppm |
| | 25211h | Tampax/ Radiant/ Regular/ Sample 2 | 0.174 ppm |
| | 25211i | Tampax/ Light/ Sample 2 | 0.144 ppm |
| | 25211j | Tampax/ Light/ Sample 2 | 0.146 ppm |
| | 25211k | Tampax/ Radiant/ Super/ Sample 2 | 0.126 ppm |
| | 25211l | Tampax/ Radiant/ Super/ Sample 2 | 0.250 ppm |
| | 25211m | Tampax/ Radiant/ Light/ Sample 1 | 0.139 ppm |
| | 25211n | Tampax/ Radiant/Light/ Sample 2 | 0.146 ppm |
| | 25211o | Tampax/ Radiant/Light/ Sample 3 | 0.156 ppm |
| | 25211p | Tampax/ Regular/ Sample 1 | 0.164 ppm |
| | 25211q | Tampax/Regular/ Sample 2 | 0.171 ppm |
| | 25211r | Tampax/ Regular/ Sample 3 | 0.171 ppm |
| | 25211s | Tampax/ Light/ Sample 1 | 0.173 ppm |
| | 25211t | Tampax/ Light/ Sample 2 | 0.149 ppm |
| | 25211u | Tampax/ Light/ Sample 3 | 0.141 ppm |
| Amanda Murray (MA) | 25256a | Tampax/ (R)/ #1 | 0.408 ppm |
| | 25256b | Tampax/ (R)/ #2 | 0.224 ppm |
| | 25256c | Tampax/ (R)/ #3 | 0.194 ppm |
| | 25256d | Tampax/ (R)/ #4 | 0.202 ppm |
| | 25256e | Tampax/ (R)/ #5 | 0.218 ppm |
| | 25256f | Tampax/ (R)/ #6 | 0.279 ppm |
| | 25256g | Tampax/ (S)/ #1 | 0.241 ppm |

| | | | |
|---|---|---|---|
| | 25256h | Tampax/ (S)/ #2 | 0.289 ppm |
| | 25256i | Tampax/ (S)/ #3 | 0.253 ppm |
| | 25256j | Tampax/ (S)/ #4 | 0.308 ppm |
| | 25256k | Tampax/ (L)/ #1 | 0.159 ppm |
| | 25256l | Tampax/ (L)/ #2 | 0.298 ppm |
| | 25256m | Tampax/ (L)/ #3 | 0.185 ppm |
| | 25256n | Tampax/ (L)/ #4 | 0.158 ppm |
| Stephanie Maya (MI) | 25259a | Tampax Radiant Regular (R) | 0.209 ppm |
| | 25259b | Tampax Radiant Super (S) | 0.134 ppm |
| | 25259c | Tampax Regular (R) | 0.214 ppm |
| | 25259d | Tampax Super (S) | 0.213 ppm |
| | 25259e | Playtex Sport Regular (R) | 0.347 ppm |
| | 25259f | Playtex Sport Super (S) | 0.381 ppm |
| Katherine Vescovo (MO) | 25229a | Tampax Super Pearl | 0.219 ppm |
| | 25229b | Tampax Super Plus Pearl | 0.250 ppm |
| | 25229c | Tampax Ultra Pearl | 0.181 ppm |
| Dena Habboush (NJ) | 250304a | Tampax #1 | 0.206 ppm |
| | 250304b | Tampax #2 | 0.204 ppm |
| | 250304c | Tampax #3 | 0.223 ppm |
| | 250304d | Tampax #4 | 0.197 ppm |
| | 250304e | Tampax #5 | 0.215 ppm |
| | 250304f | Tampax #6 | 0.164 ppm |
| Carmuse Mitchem (NY) | 25194a | Tampax Super Plus | 0.216 ppm |
| | 25194b | Tampax Super Plus | 0.127 ppm |
| | 25194c | Tampax Super Plus | 0.214 ppm |

56. These lead levels are between 12.6x and up to 40.8x higher than the EPA action level standard for lead in drinking water.[21] 40 CFR 141.80(a) et seq.

---

[21] The EPA action level standard, effective as of December 30, 2024, is a concentration of 0.010 mg of lead per liter (which is equivalent to 0.010 parts per billion). 40 CFR 141.80(c)(1).

Additionally, it's important to note that, beyond these action levels, the EPA established a "maximum contaminant level goal" for lead of zero, "in part due to lead being a probable carcinogen and due to there being no clear threshold below which there are no risks of (negative) health effects." 89 FR 86418 (A Rule by the Environmental Protection Agency on October 30, 2024; available at https://www.federalregister.gov/d/2024-23549/p-111, last visited October 2, 2025).

57.     Plaintiffs' testing also showed that, compared to other tampon products that Defendant itself manufactures, as well as tampons that competitors manufacture, the Products at issue in the present matter contain *400 times more* lead.

58.     Other brands, such as Lola (founded in 2014)[22] and Viv (founded in 2020)[23] advertise that their tampons are lead-free.

59.     Defendant's Products could therefore be produced with substantially lower lead levels or, as others in the industry do, zero lead.

60.     Plaintiffs' second round of testing was conducted approximately one year after the 2024 *Shearston* study and after the first lawsuit filed against it in California for manufacturing tampon products that contained undisclosed heavy metals. Despite Defendant's actual notice of the lead content in its Products due at least to the study and lawsuits, Defendant has continued to manufacture the Products with detectable heavy metal content without adequate notice or warnings to consumers on the Products' packaging and labeling.

61.     California's Proposition 65 sets the Maximum Allowable Dose Level ("MADL") for reproductive toxicity at 0.5 micrograms of lead per day.

62.     The products label instructs and /or directs that a single tampon be used for "FOR 8 HOURS MAXIMUM" and for 'Up to 8 [hours]".

63.     Based on the instruction to use a single tampon for a maximum of eight hours, Plaintiffs and Class members typically use a minimum of three tampons in a day (24-hour period), every month.[24] However, most consumers of Defendants' Products use an average of more than

---

[22] https://mylola.com/blogs/periods/metals-in-tampons-what-you-need-to-know
[23] https://vivforyourv.com/blogs/news/tampons-without-lead-meet-viv-tampons
[24] According to a study published in the *Journal of Women's Health*, tampons should be changed every 4-8 hours to prevent the risk of Toxic Shock Syndrome (TSS). https://femtechinsider.com/how-many-tampons-do-i-need-per-day/.

three tampons in a day as acknowledged by Defendant on its webpage – "use of '3-6' products per day (pads or tampons) is normal."[25]

64.    Plaintiffs and Class members' use of the Products as directed exposes Plaintiffs to substantially more lead than the MADL.

65.    As shown in the chart below, comparing the homogenous testing results to the use of 3-6 tampons per day exposes Plaintiffs and Class members to substantially more than the MADL:

| Product | Lead Content | 3 Tampons | 6 Tampons |
|---|---|---|---|
| Tampax Pearl Ultra Tampons | 0.196 ppm | 0.588 ppm | 1.176 ppm |
| Tampax Pearl Super Tampons | 0.235 ppm | 0.705 ppm | 1.410 ppm |
| Tampax Pearl Super Plus Tampons | 0.239 ppm | 0.717 ppm | 1.434 ppm |
| Tampax Pearl Regular Tampons | 0.150 ppm | 0.450 ppm | 0.900 ppm |

66.    The highest Plaintiffs' sample of 0.408 ppm would result in 1.224 ppm for three tampons or 2.448 ppm for six tampons.

67.    Even the lowest Plaintiffs' sample of 0.120 ppm would result in 0.36 for three tampons or 0.72 for six tampons.

68.    Defendant claims that consumers have the "right to know what's in the products you're using" yet, as illustrated below, Defendant mispresents and omits that the Products contain Lead, a harmful neurotoxin. [26]

---

[25] https://tampax.com/en-us/tampon-truths/best-tampons-sizes-for-heavy-light-flow/
[26] https://tampax.co.uk/en-gb/tampon-truths/what-is-tampon/



**#1 U.S. GYNECOLOGIST RECOMMENDED TAMPON BRAND††**
LA MARQUE DE TAMPONS LA PLUS RECOMMANDÉE PAR LES GYNÉCOLOGUES AUX É.-U.††

✓ **FREE OF PERFUME**
SANS PARFUM

✓ **FREE OF ELEMENTAL CHLORINE BLEACHING**
SANS BLANCHIMENT AU CHLORE ÉLÉMENTAIRE

✓ **TAMPON FREE OF DYES**
TAMPON SANS COLORANT

✓ **CLINICALLY TESTED GENTLE TO SKIN**
DOUCEUR POUR LA PEAU ÉPROUVÉE EN CLINIQUE

INGREDIENTS/INGRÉDIENTS/INGREDIENTES: RAYON, COTTON, POLYPROPYLENE, POLYETHYLENE, POLYESTER/POLIÉSTER, GLYCERIN, PARAFFIN, ETHOXYLATED FATTY ACID ESTERS/ESTERS D'ACIDES GRAS ÉTHOXYLÉS/ÉSTERES DE ÁCIDOS GRASOS ETOXILADOS, PEG-100 STEARATE, TITANIUM DIOXIDE

Learn more about your product and its ingredients

Apprenez-en plus sur votre produit et ses ingrédients

**TAMPAX.COM**

*Our best Pearl protection ever*

*Notre meilleure protection Pearl jamais offerte*

SCAN ME

TAMPAX

BALAYEZ-MOI

**USE FOR 8 HOURS MAXIMUM.**
LES TAMPONS PEUVENT S'UTILISER PENDANT UN MAXIMUM DE 8 HEURES.
PUEDEN USARSE POR UN MÁXIMO DE 8 HORAS.

MAX 8H

††based on a 2020 survey/†† selon un sondage réalisé en 2020



69. It is not inevitable that tampons will have unsafe levels of lead in them, as evidenced by other tampons Defendant manufactures with no detectable lead, including Tampax Pure Cotton Tampons or L. brand tampons.

### III. Defendant misrepresented, concealed, and omitted material information about the presence of lead in the Products

70. Consumers are reasonably concerned with a risk of exposure to lead due to the significant dangers to human health.

71. Plaintiffs and Class members' concern about lead exposure from tampons is reasonably heightened because lead can be directly absorbed vaginally into the blood stream.

72.     Lead disclosures are common and widespread. Consumers are often warned when there is a risk of exposure to lead or even a risk of possible exposure to lead in food, water, and building materials.

73.     Under Proposition 65, under California Lead Law, a consumer product exposing a consumer to lead must provide proper warnings. CA HLTH. §25249.6. These warnings provide:

- Lead is on the Proposition 65 list because it can cause birth defects or other reproductive harm. Exposure to lead during pregnancy can affect brain development and cause learning and behavior problems for the child. Exposure to lead can harm the reproductive systems of men and women.
- Lead and lead compounds also are on the Proposition 65 list because they can cause cancer. Exposure to lead and lead compounds may increase cancer risk.
- Proposition 65 requires businesses to determine if they must provide a warning about exposure to listed chemicals.

74.     Defendant is a large and sophisticated corporation that have been in the business of producing, manufacturing, selling, and distributing healthcare and consumer products for many years, including producing and manufacturing the contaminated Products.

75.     Defendant is in the unique and superior position of knowing the ingredients and raw materials used in the manufacturing of their Products and possess unique and superior knowledge regarding the manufacturing process of the Products, the manufacturing process of the ingredients and raw materials the Products contain, and the risks associated with those processes, such as the risk of lead contamination, as well as the ability to test the Products for lead contamination prior to releasing the Products into the stream of commerce.

76.     Accordingly, Defendant possesses superior knowledge regarding the risks involved in the production and manufacturing of their Products. Such knowledge is not readily available to consumers like Plaintiff and Class Members. the levels of toxic chemicals such as lead contained

therein. Defendant had or should have had exclusive knowledge of the Lead levels in the Products, and Plaintiff and the Class could not have known about this risk.

77.     Defendant knew or should have known of the Lead in the Products. Defendant has a duty and responsibility to implement controls to significantly minimize or prevent exposure to chemical hazards in the Products. Defendant manufactures and sources the contents contained within the Products. Defendant tests the Products for quality control purposes, including

78.     Defendant's knowledge of the extreme health risks associated with lead exposure and the risks that Defendant's manufacturing processes could cause the Products to be contaminated with lead mean that Defendant knows or should know that the Products contain lead.

79.     Defendant, like other manufactures, could have and should have manufactured and sold the Products without any lead in them.

80.     Defendant should have investigated and disclosed the lead in the Products based on the health risk associated with use of the Products and because the Products are unfit for consumer use.

81.     Defendant could have included the required disclosures for lead on its product packaging, as is common in other products that may expose consumers to lead.

82.     Lead disclosures are standardized under California Proposition 65[27]:

⚠ WARNING: This product can expose you to lead, which is known to the State of California to cause cancer and birth defects or reproductive harm. (For more information go to www.p65warnings.ca.gov)

---

[27] https://www.p65warnings.ca.gov/fact-sheets/lead-and-lead-compounds

83. For example, ceramics, imported candy, and chocolate are common sources of lead which require disclosures.[28]





---

[28] https://www.thetakeout.com/what-the-lead-warning-on-your-candy-actually-means-1848768941/;
https://www.coracaoconfections.com/blogs/news/what-s-up-with-heavy-metals-in-chocolate-all-about-prop-65

84.     Instead, Defendant is using a marketing and advertising campaign that omits from the Products' packaging and content lists that the Products contain lead or are at risk of containing lead.

85.     Defendant's marketing and advertising campaign includes the one place that every consumer looks when purchasing a product—the packaging and labels themselves:



**#1 U.S. GYNECOLOGIST RECOMMENDED TAMPON BRAND††**
LA MARQUE DE TAMPONS LA PLUS RECOMMANDÉE PAR LES GYNÉCOLOGUES AUX É.-U.††

✓ **FREE OF PERFUME**
SANS PARFUM

✓ **FREE OF ELEMENTAL CHLORINE BLEACHING**
SANS BLANCHIMENT AU CHLORE ÉLÉMENTAIRE

✓ **TAMPON FREE OF DYES**
TAMPON SANS COLORANT

✓ **CLINICALLY TESTED GENTLE TO SKIN**
DOUCEUR POUR LA PEAU ÉPROUVÉE EN CLINIQUE

INGREDIENTS/INGRÉDIENTS/INGREDIENTES: RAYON, COTTON, POLYPROPYLENE, POLYETHYLENE, POLYESTER/POLIÉSTER, GLYCERIN, PARAFFIN, ETHOXYLATED FATTY ACID ESTERS/ESTERS D'ACIDES GRAS ÉTHOXYLÉS/ÉSTERES DE ÁCIDOS GRASOS ETOXILADOS, PEG-100 STEARATE, TITANIUM DIOXIDE

Learn more about your product and its ingredients

Apprenez-en plus sur votre produit et ses ingrédients

TAMPAX.COM

*Our best Pearl protection ever*

*Notre meilleure protection Pearl jamais offerte*

SCAN ME

TAMPAX

BALAYEZ-MOI

**USE FOR 8 HOURS MAXIMUM.**
LES TAMPONS PEUVENT S'UTILISER PENDANT UN MAXIMUM DE 8 HEURES.
PUEDEN USARSE POR UN MÁXIMO DE 8 HORAS.

MAX 8H

††based on a 2020 survey/†† selon un sondage réalisé en 2020



86. Defendant's misleading representations include that the Products are "#1 U.S. Gynecologist Recommended Tampon Brand," "Out of Sight, Out of Mind Protection," "Free of Perfume," "Free of Elemental Chlorine Bleaching," "Core Free of Dyes," "Clinically Tested Gentle to Skin," and "Made with Care Since 1936."

87. The labels and packaging present a unified message that the Products are safe to use, are merchantable, and free from potentially harmful substances and ingredients.

88. Despite numerous disclosures and representations about the Products on the labels and packaging, including disclosures and representations about the inclusion or exclusion of certain ingredients, there are no disclosures or representations about lead.

89. A reasonable consumer would understand the lack of disclosures or representations about lead to mean that there is no lead in the Products.

90.    Defendant's overall marketing message is that the Products are healthy and safe to use and do not contain harmful substances and ingredients.

91.    Reasonable consumers would not think that Defendants are omitting the fact that they contain (or risk containing) dangerous contaminants like lead from the packaging because that information would be material to a reasonable consumer.

92.    Plaintiffs and Class members thus reasonably relied on Defendant's representations on the Products packaging and the omissions and believed that the Products were safe to use.

93.    Defendant's advertising and marketing campaign for the Products is false, deceptive, and misleading because it does not disclose the unsafe levels of lead in the Products. Lead in hygiene products, especially ones inserted into the body, is material to reasonable consumers, because this neurotoxin poses serious health risks, even in small doses. Additionally, the lead levels in the Products could not be known before purchasing them and may not be determined without extensive and expensive scientific testing. Accordingly, consumers rely on Defendant to be truthful regarding the contents, including the existence of lead in the Products.

94.    On the other hand, Defendant knew or should have known of the existence of lead in the Products. Defendant sources the contents and manufactures the Products and has exclusive knowledge of the quality control testing on the Products and the contents contained therein. In addition, Defendant was aware or should have been aware of other tampons on the market which were manufactured free of heavy metals.

95.    Despite the elevated risks of lead absorption vaginally, Defendant failed to disclose lead contamination in their Products. On the contrary, Defendant made misleading affirmative representations on its packaging and on its website that were material to Plaintiffs and Class members' purchases of the Products.

24

96. Defendant claims that consumers have the "right to know what's in the products you're using" yet, as illustrated below, Defendant mispresents and omits that the Products contain lead.[29]

97. Defendant also affirmatively creates the impression that its Products are "free" of unnatural ingredients and "gentle" on the body despite the Products containing lead.

98. Defendant represents that its products are "Made with Care," "comfort[able]," and to be used without worry—"Out of Sight, Out of Mind Protection [TM]."

99. Defendants are attempting to, and in fact are, creating the impression in the minds of consumers that these products are safe to use.

100. These representations, when read together and with context, are conceptually related to one another and to the idea that the Products are free from harmful substances, like lead.

101. These representations are voluntary and intentional advertising statements which are not required by any legal or regulatory rule.

102. The disclosure of lead in the Products would negatively impact the sales of Defendants' products.

103. If consumers knew that Defendant's Products contained elevated levels of lead in them, they would not purchase them.

104. Defendants intentionally misrepresented, concealed, and omitted material information about the presence of lead in the Products because Defendant would then be able to charge a premium price for the Products substantially higher than consumer would pay if they knew that there was lead in the Products.

---

[29] https://tampax.co.uk/en-gb/tampon-truths/what-is-tampon/

25

105.    In order to avoid this loss of sales, Defendant has chosen to continue to advertise the Products as safe and free from potentially harmful substances.

106.    Throughout the relevant time period, despite immaterial changes to packaging design, Defendant's material representations and omissions, especially those regarding lead contamination, have remained consistent—that the Products are safe and do not contain or risk containing lead.

107.    Throughout the relevant time period, including at least as early as August 2020, Defendant has consistently advertised and marketed the Products as safe.[30]

108.    Defendant has only recently acknowledged on its website that its Products are at risk of containing lead, adding a page to its website in or around October 2024 disclosing the risk.[31]

109.    By comparison, for example, in or around June 2022, Defendant's website did not contain any disclosures or representations about lead, despite having numerous disclosures and representations about its safety, ingredients, manufacturing standards, and scientific research.[32]

110.    Defendant touts its approval through independent laboratory tests, attaining the OEKO-TEX Standard 100 certification:

> **Independent Laboratory Tests**
>
> In addition to the reviews and guidance provided by the Scientific Advisory Board (SAB), our products are tested and evaluated by independent, third-party laboratories.
>
> **OEKO-TEX®**, a globally recognized independent research and test institute, granted Tampax tampons the OEKO-TEX Standard 100 certification. This means that every component of the product was

---

[30] https://www.youtube.com/watch?v=52gISZb6m4g
[31] https://web.archive.org/web/20241001143631/https://tampax.com/en-us/about/tampon-safety-science/
[32] https://web.archive.org/web/20220623233316/https://tampax.com/en-us/about/ingredients/ingredients-safety-process/

**tested for up to 1,000 harmful substances, including heavy metals**, and succeeded in meeting the stringent safety criteria.[33]

111. But Defendant now acknowledges that their products carry a risk of containing—and even are likely to contain—lead:

### What's the Deal with Heavy Metals and Tampons?

Many everyday items may contain trace levels of environmental substances - which include metals like lead and arsenic. These can occasionally be detected using very sensitive analytical equipment. But rest assured, the trace amount of metals that could be found in a tampon is very small – not unlike the low amounts found in the food and water you consume every day.

Since these trace amounts can be found everywhere in the environment, regulatory bodies like the FDA and the WHO set allowable limits for things like drinking water to drive exposure as low as reasonably possible.[34]

112. Yet Defendant has not provided any warnings or information regarding heavy metals on their Product *labels*, which are what consumers read and rely on when purchasing the Products.

113. What's more, Defendant doesn't tell the whole truth about the heavy metals in the products and health risks associated with use of the Products.

114. Instead, Defendant downplays the levels of heavy metals calling them trace amounts and omits any of the health risks and dangers associated with exposure to heavy metals.

115. Despite the statements on the webpage about heavy metals in the products, Defendant's representations and statements on the Products packaging and the webpage are false, misleading, and omit material information to consumers regarding the dangerous levels of heavy

---

[33] https://tampax.com/en-us/about/tampon-safety-science/
[34] https://tampax.com/en-us/about/tampon-safety-science/

metals in the Products and the health risks and dangers associated with continued and repeated use of the Products.

116. Defendant continues to use deceptive labels and advertising on the Products labels and omits any information whatsoever about the Products containing lead. And, as discussed above, the statements on the webpage further mislead consumers into thinking that they have nothing to worry about from heavy metals being in the products.

## IV. Survey conducted by Plaintiffs' counsel shows that the presence of lead in tampons is material to consumers

117. In October 2025, Plaintiffs' counsel conducted a survey of adult consumers who had purchased the Products within the preceding months. In this survey of 415 consumers across 40 states (including all states for which there are plaintiffs in the present matter), 96.9% of respondents indicated that the presence of lead was important or very important to their purchasing decisions, 94% of respondents indicated they expect a company to test for lead, and 95% of respondents stated that a company should disclose to consumers testing results for lead.

118. Defendants' omissions regarding lead prevents consumers from obtaining full and complete information regarding the total amount of lead they are being exposed to. This inhibits consumers' decision-making regarding their cumulative exposure to lead.

119. Defendant is in the unique and superior position of knowing the ingredients and raw materials used in the manufacturing of their Products and possesses unique and superior knowledge regarding the manufacturing process of the Products, the manufacturing process of the ingredients and raw materials the Products contain, and the risks associated with those processes, such as the risk of lead contamination, as well as the ability to test the Products for lead contamination prior to releasing the Products into the stream of commerce.

120.    Such knowledge is not readily available to consumers like Plaintiffs and Class members.

121.    Testing for lead in tampons requires expensive and destructive scientific testing, and no reasonable consumer would engage in such testing before purchasing the Products.

122.    Consumers therefore must and do rely on Defendant to disclose and truthfully report what their Products contain on their packaging or labels.

123.    Plaintiffs and Class members therefore reasonably relied on Defendant's representations that the Products were safe to use and did not contain lead.

124.    Plaintiffs and Class members also reasonably relied on Defendant's omissions from the product labels regarding any presence of risk of presence of lead.

125.    Plaintiffs and Class members would not have purchased the Products or they would have only paid substantially less if they had known the Products contained lead.

126.    Consumers have been deprived of making the informed choice between the Products, which contain lead, and other menstrual products, which do not.

127.    As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representation and omission, Defendant injured Plaintiffs and the Class members in that they:

        a.    Paid a sum of money for Products that were not what Defendant represented;

        b.    Paid a premium price for Products that were not what Defendant represented;

        c.    Were deprived of the benefit of the bargain because the Products they purchased was different from what Defendant warranted; and

        d.    Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented.

29

128.     Plaintiffs would consider purchasing the Products in the future if Defendant ceased its deceptive marketing of the Products and the Products did not contain lead.

129.     Plaintiffs and Class members continue to suffer harm because they are not able to rely on the labeling and advertising of the Products for their truth, and are therefore unable to determine whether they can purchase the Products in the future.

130.     Unless Defendant is enjoined from failing to disclose the presence of lead in the Products in the future, Plaintiffs and consumers will not be able to reasonably determine whether the lead in the Products has been addressed and remedied.

131.     Accordingly, Plaintiff's legal remedies are inadequate to provide complete relief and prevent future injuries.

## PLAINTIFFS FACTUAL ALLEGATIONS

### A.   California Plaintiff Ciji Sanchez

132.     Plaintiff Sanchez is an individual consumer who, at all relevant times, was a citizen of California.

133.     Plaintiff purchased the Products, from multiple stores during the Class Period, including on or around May 11, 2024, at Sam's Club, 8250 Power Inn Rd. Sacramento, CA 95828.

134.     Prior to purchasing the Products, Plaintiff read and relied on the Product labels which represent that the Products are safe and omit any information about containing lead.

135.     Plaintiff purchased the Products in reliance on Defendant's representations on the Products' packaging and labeling.

136.     Plaintiff reasonably believed that the Products did not contain lead.

137.    Plaintiff reasonably believes that products that do not list that they contain a harmful substance like lead do not contain that lead because lead is a harmful neurotoxin that is unsafe at any level.

138.    Whether a tampon contains lead is material to Plaintiff's decision to purchase the product because there is no safe level of lead exposure.

139.    Had Defendant disclosed that the Products contained lead, Plaintiff would not have been willing to pay the same amount for the Products or would not have been willing to purchase the Products. Plaintiff purchased and paid more for the Products than she would have had she known the truth about the Products. The Products Plaintiff received were worth less than the Products for which she paid.

140.    Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

141.    If Defendant ceases its unfair and deceptive conduct and manufactured the Products without lead, Plaintiff would consider purchasing the Products in the future.

**B.  Florida Plaintiff Wendy Rodriguez**

142.    Plaintiff Rodriguez is an individual consumer who, at all relevant times, was a citizen of Florida.

143.    Plaintiff purchased the Products during the Class Period, including in or around August 21, 2024, from multiple stores, including The FSA Store and Amazon.

144.    Prior to purchasing the Products, Plaintiff read and relied on the Product labels which represent that the Products are safe and omit any information about containing lead.

145.    Plaintiff purchased the Products in reliance on Defendant's representations on the Products' packaging and labeling.

31

146.    Plaintiff reasonably believed that the Products did not contain lead.

147.    Plaintiff reasonably believes that products that do not list that they contain a harmful substance like lead do not contain that lead because lead is a harmful neurotoxin that is unsafe at any level.

148.    Whether a tampon contains lead is material to Plaintiff's decision to purchase the product because there is no safe level of lead exposure.

149.    Had Defendant disclosed that the Products contained lead, Plaintiff would not have been willing to pay the same amount for the Products or would not have been willing to purchase the Products. Plaintiff purchased and paid more for the Products than she would have had she known the truth about the Products. The Products Plaintiff received were worth less than the Products for which she paid.

150.    Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

151.    If Defendant ceases its unfair and deceptive conduct and manufactured the Products without lead, Plaintiff would consider purchasing the Products in the future.

### C.  Illinois Plaintiff Olga Otkina

152.    Plaintiff Otkina is an individual consumer who, at all relevant times, was a citizen of Illinois.

153.    Plaintiff purchased the Products during the Class Period, including in or around November 4, 2024, from multiple stores, including Sam's Club.

154.    Prior to purchasing the Products, Plaintiff read and relied on the Product labels which represent that the Products are safe and omit any information about containing lead.

155. Plaintiff purchased the Products in reliance on Defendant's representations on the Products' packaging and labeling.

156. Plaintiff reasonably believed that the Products did not contain lead.

157. Plaintiff reasonably believes that products that do not list that they contain a harmful substance like lead do not contain that lead because lead is a harmful neurotoxin that is unsafe at any level.

158. Whether a tampon contains lead is material to Plaintiff's decision to purchase the product because there is no safe level of lead exposure.

159. Had Defendant disclosed that the Products contained lead, Plaintiff would not have been willing to pay the same amount for the Products or would not have been willing to purchase the Products. Plaintiff purchased and paid more for the Products than she would have had she known the truth about the Products. The Products Plaintiff received were worth less than the Products for which she paid.

160. Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

161. If Defendant ceases its unfair and deceptive conduct and manufactured the Products without lead, Plaintiff would consider purchasing the Products in the future.

### D. Maryland Plaintiff LaReina Green

162. Plaintiff Green is an individual consumer who, at all relevant times, was a citizen of Maryland.

163. Plaintiff purchased the Products during the Class Period, on March 20, 2024 through her FSA account online through CVS.

164. Prior to purchasing the Products, Plaintiff read and relied on the Product labels which represent that the Products are safe and omit any information about containing lead.

165. Plaintiff purchased the Products in reliance on Defendant's representations on the Products' packaging and labeling.

166. Plaintiff reasonably believed that the Products did not contain lead.

167. Plaintiff reasonably believes that products that do not list that they contain a harmful substance like lead do not contain that lead because lead is a harmful neurotoxin that is unsafe at any level.

168. Whether a tampon contains lead is material to Plaintiff's decision to purchase the product because there is no safe level of lead exposure.

169. Had Defendant disclosed that the Products contained lead, Plaintiff would not have been willing to pay the same amount for the Products or would not have been willing to purchase the Products. Plaintiff purchased and paid more for the Products than she would have had she known the truth about the Products. The Products Plaintiff received were worth less than the Products for which she paid.

170. Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

171. If Defendant ceases its unfair and deceptive conduct and manufactured the Products without lead, Plaintiff would consider purchasing the Products in the future.

**E. Massachusetts Plaintiff Amanda Murray**

172. Plaintiff Murray is an individual consumer who, at all relevant times, was a citizen of Massachusetts.

173. Plaintiff purchased the Products during the Class Period, August 12, 2023, at Target in Haverhill, Massachusetts in addition to multiple other stores.

174. Prior to purchasing the Products, Plaintiff read and relied on the Product labels which represent that the Products are safe and omit any information about containing lead.

175. Plaintiff purchased the Products in reliance on Defendant's representations on the Products' packaging and labeling.

176. Plaintiff reasonably believed that the Products did not contain lead.

177. Plaintiff reasonably believes that products that do not list that they contain a harmful substance like lead do not contain that lead because lead is a harmful neurotoxin that is unsafe at any level.

178. Whether a tampon contains lead is material to Plaintiff's decision to purchase the product because there is no safe level of lead exposure.

179. Had Defendant disclosed that the Products contained lead, Plaintiff would not have been willing to pay the same amount for the Products or would not have been willing to purchase the Products. Plaintiff purchased and paid more for the Products than she would have had she known the truth about the Products. The Products Plaintiff received were worth less than the Products for which she paid.

180. Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

181. If Defendant ceases its unfair and deceptive conduct and manufactured the Products without lead, Plaintiff would consider purchasing the Products in the future.

**F. Michigan Plaintiff Stephanie Maya**

35

182.    Plaintiff Maya is an individual consumer who, at all relevant times, was a citizen of Michigan.

183.    Plaintiff purchased the Products during the Class Period, to wit: Plaintiff Maya had a subscription from Amazon where she automatically purchased the Products every six months, most recently on March 13, 2025.

184.    Prior to purchasing the Products, Plaintiff read and relied on the Product labels which represent that the Products are safe and omit any information about containing lead.

185.    Plaintiff purchased the Products in reliance on Defendant's representations on the Products' packaging and labeling.

186.    Plaintiff reasonably believed that the Products did not contain lead.

187.    Plaintiff reasonably believes that products that do not list that they contain a harmful substance like lead do not contain that lead because lead is a harmful neurotoxin that is unsafe at any level.

188.    Whether a tampon contains lead is material to Plaintiff's decision to purchase the product because there is no safe level of lead exposure.

189.    Had Defendant disclosed that the Products contained lead, Plaintiff would not have been willing to pay the same amount for the Products or would not have been willing to purchase the Products. Plaintiff purchased and paid more for the Products than she would have had she known the truth about the Products. The Products Plaintiff received were worth less than the Products for which she paid.

190.    Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

191.     If Defendant ceases its unfair and deceptive conduct and manufactured the Products without lead, Plaintiff would consider purchasing the Products in the future.

**G.   Missouri Plaintiff Katherine Vescovo**

192.     Plaintiff Vescovo is an individual consumer who, at all relevant times, was a citizen of Missouri.

193.     Plaintiff purchased the Products from multiple stores during the Class Period, including on or around December 16, 2024, at Schnuck, 6600 Clayton Rd. Clayton, MO 63117.

194.     Prior to purchasing the Products, Plaintiff read and relied on the Product labels which represent that the Products are safe and omit any information about containing lead.

195.     Plaintiff purchased the Products in reliance on Defendant's representations on the Products' packaging and labeling.

196.     Plaintiff reasonably believed that the Products did not contain lead.

197.     Plaintiff reasonably believes that products that do not list that they contain a harmful substance like lead do not contain that lead because lead is a harmful neurotoxin that is unsafe at any level.

198.     Whether a tampon contains lead is material to Plaintiff's decision to purchase the product because there is no safe level of lead exposure.

199.     Had Defendant disclosed that the Products contained lead, Plaintiff would not have been willing to pay the same amount for the Products or would not have been willing to purchase the Products. Plaintiff purchased and paid more for the Products than she would have had she known the truth about the Products. The Products Plaintiff received were worth less than the Products for which she paid.

200. Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

201. If Defendant ceases its unfair and deceptive conduct and manufactured the Products without lead, Plaintiff would consider purchasing the Products in the future.

**H. New Jersey Plaintiff Dena Habboush**

202. Plaintiff Habboush is an individual consumer who, at all relevant times, was a citizen of New Jersey.

203. Plaintiff purchased the Products from multiple stores during the Class Period, including on or around July 3, 2025, at CVS, 375 Queen Anne Road, Teaneck NJ 07666.

204. Prior to purchasing the Products, Plaintiff read and relied on the Product labels which represent that the Products are safe and omit any information about containing lead.

205. Plaintiff purchased the Products in reliance on Defendant's representations on the Products' packaging and labeling.

206. Plaintiff reasonably believed that the Products did not contain lead.

207. Plaintiff reasonably believes that products that do not list that they contain a harmful substance like lead do not contain that lead because lead is a harmful neurotoxin that is unsafe at any level.

208. Whether a tampon contains lead is material to Plaintiff's decision to purchase the product because there is no safe level of lead exposure.

209. Had Defendant disclosed that the Products contained lead, Plaintiff would not have been willing to pay the same amount for the Products or would not have been willing to purchase the Products. Plaintiff purchased and paid more for the Products than she would have had she

known the truth about the Products. The Products Plaintiff received were worth less than the Products for which she paid.

210. Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

211. If Defendant ceases its unfair and deceptive conduct and manufactured the Products without lead, Plaintiff would consider purchasing the Products in the future.

**I. New York Plaintiff Carmuse Mitchem**

212. Plaintiff Mitchem is an individual consumer who, at all relevant times, was a citizen of New York.

213. Plaintiff purchased the Products during the Class Period, including in or around January 6, 2025, from multiple stores, including CVS, 342 East 23rd St., New York, NY 10010.

214. Prior to purchasing the Products, Plaintiff read and relied on the Product labels which represent that the Products are safe and omit any information about containing lead.

215. Plaintiff purchased the Products in reliance on Defendant's representations on the Products' packaging and labeling.

216. Plaintiff reasonably believed that the Products did not contain lead.

217. Plaintiff reasonably believes that products that do not list that they contain a harmful substance like lead do not contain that lead because lead is a harmful neurotoxin that is unsafe at any level.

218. Whether a tampon contains lead is material to Plaintiff's decision to purchase the product because there is no safe level of lead exposure.

219. Had Defendant disclosed that the Products contained lead, Plaintiff would not have been willing to pay the same amount for the Products or would not have been willing to purchase

the Products. Plaintiff purchased and paid more for the Products than she would have had she known the truth about the Products. The Products Plaintiff received were worth less than the Products for which she paid.

220.    Plaintiff was injured in fact and lost money as a result of Defendant's improper conduct.

221.    If Defendant ceases its unfair and deceptive conduct and manufactured the Products without lead, Plaintiff would consider purchasing the Products in the future.

## CLASS ALLEGATIONS

222.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class (collectively "the Class"):

> All consumers who purchased the Products anywhere in the United States during the relevant statute of limitations.

223.    Plaintiff Sanchez brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself, on behalf of all others similarly situated, and as a member of the California Subclass defined as follows:

> All consumers who purchased the Products in the State of California at any time during the relevant statute of limitations ("California Subclass").

224.    Plaintiff Otkina brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself, on behalf of all others similarly situated, and as a member of the Illinois Subclass defined as follows:

> All consumers who purchased the Products in the State of Illinois at any time during the relevant statute of limitations ("Illinois Subclass").

225. Plaintiff Rodriguez brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself, on behalf of all others similarly situated, and as a member of the Florida Subclass defined as follows:

> All consumers who purchased the Products in the State of Florida at any time during the relevant statute of limitations ("Florida Subclass").

226. Plaintiff Green brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself, on behalf of all others similarly situated, and as a member of the Maryland Subclass defined as follows:

> All consumers who purchased the Products in the State of Maryland at any time during the relevant statute of limitations ("Maryland Subclass").

227. Plaintiff Murray brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself, on behalf of all others similarly situated, and as a member of the Massachusetts Subclass defined as follows:

> All consumers who purchased the Products in the State of Massachusetts at any time during the relevant statute of limitations ("Massachusetts Subclass").

228. Plaintiff Maya brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself, on behalf of all others similarly situated, and as a member of the Michigan Subclass defined as follows:

> All consumers who purchased the Products in the State of Michigan at any time during the relevant statute of limitations ("Michigan Subclass").

229. Plaintiff Vescovo brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself, on behalf of all others similarly situated, and as a member of the Missouri Subclass defined as follows:

>All consumers who purchased the Products in the State of Missouri at any time during the relevant statute of limitations ("Missouri Subclass").

230. Plaintiff Habboush brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself, on behalf of all others similarly situated, and as a member of the New Jersey Subclass defined as follows:

>All consumers who purchased the Products in the State of New Jersey at any time during the relevant statute of limitations ("New Jersey Subclass").

231. Plaintiff Mitchem brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself, on behalf of all others similarly situated, and as a member of the New York Subclass defined as follows:

>All consumers who purchased the Products in the State of New York at any time during the relevant statute of limitations ("New York Subclass").

232. Excluded from the Class and Subclasses are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has a controlling interest; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (iv) all persons presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and (v) any judicial officer presiding over this matter and their immediate families and judicial staff.

233. The Class and Subclasses shall be referred to collectively throughout the Complaint as the Class.

234.     Plaintiffs reserve the right to amend or otherwise alter the Class definitions at the appropriate time, or to propose or eliminate the Class or Subclasses, in response to, among other factors, Defendant's legal arguments and discovery.

235.     This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23 for the reasons set forth below.

236.     <u>Numerosity</u>: Class members are so numerous that joinder of all Members is impracticable. Upon information and belief, each Class consists of hundreds of thousands of purchasers throughout each State. Accordingly, it would be impracticable to join all Members of each or any Class before the Court.

237.     <u>Common Questions Predominate</u>: There are numerous and substantial questions of law or fact common to all Class members that predominate over any individual issues. Included within the common questions of law or fact are:

a.     Whether Defendant is responsible for the conduct alleged;

b.     Whether Defendant's false and misleading statements were likely to deceive Plaintiffs and Class members;

c.     Whether Defendant's omission and failure to disclose that the Products contain lead is likely to deceive reasonable consumers;

d.     Whether Defendant engaged in unlawful, unfair or deceptive business practices by advertising, labeling and selling the Products;

e.     Whether Plaintiffs and the Class have sustained damage as a result of Defendant's unlawful conduct; and

f.     The proper measure of damages Plaintiffs and the Class sustained.

238.     <u>Typicality</u>: Plaintiffs are Class members. Plaintiffs' claims are typical of the claims of each Class Member in that every member of the Class and Subclasses were susceptible to the

43

same deceptive, misleading conduct and purchased Defendant's Products and suffered the same injury. Plaintiffs are entitled to relief under the same causes of action as the other Class members.

239. <u>Adequacy</u>: Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the Class members they seek to represent, they have a strong interest in vindicating their rights and the rights of the Class and Subclasses, they have retained counsel competent and experienced in complex class action litigation, and counsel will vigorously prosecute this action.

240. <u>Predominance</u>: Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual Class members and Subclasses. The Class and Subclass issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a focus on Defendant's deceptive and misleading marketing and labeling practices.

241. <u>Superiority</u>: A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

  a.   The joinder of thousands of individual Class members is impracticable, cumbersome, unduly burdensome, and wasteful of judicial and litigation resources;

  b.   Class members' individual claims are modest compared with the expense of litigating the claims, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

  c.   When Defendant's liability has been adjudicated, the Court may efficiently determine and administer all Class members' claims in a less burdensome and expensive manner than filing, discovery, and trial of all individual cases;

  d.   This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

  e.   Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.      This class action will assure uniformity of decisions among Class members;

g.      The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h.      Class members' interest in efficient resolution by a single class action outweighs their interests in individually controlling the prosecution of separate actions.

242.    Accordingly, this Class and the Subclasses are properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual Members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (On behalf of Plaintiff and the California Subclass)

243.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

244.    Defendant's conduct constitutes an unfair business act and practice pursuant to California Business & Professions Code § 17200, *et seq.* ("UCL"). The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ."

245.    Plaintiff brings this claim seeking restitution of the amounts Defendant acquired through the unfair, unlawful, and fraudulent business practices, as described herein; and injunctive relief to stop Defendant's misconduct, as described herein.

246. Defendant's knowing conduct, as alleged herein, constitutes an "unfair" and/or "fraudulent" business practice, as set forth in California Business & Professions Code §§ 17200-17208.

247. Defendant's conduct was and continues to be unfair and fraudulent because, directly or through its agents and employees, Defendant omitted and failed to disclose that the Products contain lead.

248. Defendant was and is aware that its omissions were material to consumers.

249. Defendant was and is aware that its omissions were misleading based on the Representations made on the Product labels, as described and depicted herein.

250. Defendant had an improper motive—to derive financial gain at the expense of accuracy or truthfulness—in its practices related to the labeling and advertising of the Products.

251. There were reasonable alternatives available to Defendant to further Defendant's legitimate business interests, other than the conduct described herein.

252. Defendant's misrepresentation and omission of material facts, as set forth herein, also constitute an "unlawful" practice because they violate California Civil Code §§ 1572, 1573, 1709, 1710, 1711, and 1770 and the laws and regulations cited herein, as well as the common law.

253. Defendant's conduct in making the omissions described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to its competitors.

254. This conduct engenders an unfair competitive advantage for Defendant, thereby constituting an unfair business practice under California Business & Professions Code §§ 17200-17208.

255. In addition, Defendant's omission that the Products contain lead constitutes an "unlawful" practice because, as described herein, the Product labels fail to comply with California's Proposition 65.

256. Accordingly, Proposition 65 provides a predicate violation for a violation of the UCL.

257. Plaintiffs and Class members could not have reasonably avoided injury. Defendant's uniform Representations and material omission regarding the Products were likely to deceive, and Defendant knew or should have known that its Representations and omission were misleading.

258. Plaintiff purchased the Products with the reasonable belief that the Products were safe and did not contain harmful elements or ingredients, and without knowledge of Defendant's material omission that the Products contain lead.

259. Plaintiffs and Class members have been directly and proximately injured by Defendant's conduct in ways including, but not limited to, the monies paid to Defendant for the Products and interest lost.

260. As a result of the business acts and practices described above, Plaintiffs and Class members are entitled to such Orders and judgments that may be necessary to disgorge Defendant's ill-gotten gains and to restore to any person in interest any money paid for the Products as a result of the wrongful conduct of Defendant.

261. Pursuant to Civil Code § 3287(a), Plaintiff and the Class are further entitled to pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the Class are entitled to interest in an amount according to proof.

262. As a result of the business acts and practices described above, pursuant to § 17203, Plaintiffs and Class members are entitled to an order enjoining such future wrongful conduct on the part of Defendant.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW**
**Cal Bus. & Prof. Code § 17500,** *et seq.*
**(On behalf of Plaintiff and the California Subclass)**

263. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

264. California Business & Professions Code § 17500 prohibits "unfair, deceptive, untrue or misleading advertising . . . ."

265. Defendant violated § 17500 by making the Representations and failing to disclose that the Products contain lead; and by representing that the Products possess characteristics and value that they do not have.

266. Defendant's deceptive practices were designed to induce reasonable consumers like Plaintiff to purchase the Products.

267. Defendant's uniform Representations and material omission that the Products contain lead were likely to deceive, and Defendant knew or should have known that they were misleading.

268. Plaintiff purchased the Products in reliance on the Product labeling, including that the Product labeling was accurate as alleged herein, and without knowledge of Defendant's misrepresentations and omission.

269. Defendant's conduct directly and proximately injured Plaintiffs and Class members in ways including, but not limited to, the price paid to Defendant for the Products, and interest lost.

48

270. The above acts of Defendant were and are likely to deceive reasonable consumers in violation of § 17500.

271. In making the Representations and omission alleged herein, Defendant knew or should have known that the Representations and omission were deceptive and/or misleading, and acted in violation of § 17500.

272. As a direct and proximate result of Defendant's unlawful conduct in violation of § 17500 Plaintiffs and Class members request an Order requiring Defendant to disgorge its ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Defendant by means of such acts of false advertising, as well as interests and attorneys' fees.

273. As a direct and proximate result of Defendant's unlawful conduct in violation of § 17500, Plaintiffs and Class members request an Order pursuant to § 17535 enjoining such future wrongful conduct on the part of Defendant.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### Cal. Civ. Code § 1750, *et seq.*
### (On behalf of Plaintiff and the California Subclass)

274. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

275. Plaintiff brings this action pursuant to California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA").

276. The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

277. The Products are "goods," as defined by the CLRA in California Civil Code §1761(a).

49

278. Defendant is a "person," as defined by the CLRA in California Civil Code §1761(c).

279. Plaintiffs and Class members are "consumers," as defined by the CLRA in California Civil Code §1761(d).

280. Purchase of the Products by Plaintiffs and Class members are "transactions," as defined by the CLRA in California Civil Code §1761(e).

281. Defendant violated Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have" by making the Representations and materially omitting and failing to disclose that the Products contain lead, as described herein.

282. Defendant also violated section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . if they are of another" by making the Representations and materially omitting and failing to disclose that the Products contain lead.

283. In addition, Defendant violated section 1770(a)(9) by advertising the Products "with intent not to sell them as advertised" in that the Products are misrepresented and misbranded as described herein.

284. Defendant's uniform Representations and omission regarding the Products were likely to deceive, and Defendant knew or should have known that its Representations and omission were deceptive and/or misleading.

285. Plaintiffs and Class members relied on Defendant's unlawful conduct and could not have reasonably avoided injury.

286. Plaintiffs and Class members were unaware of the existence of facts that Defendant suppressed and failed to disclose, including that the Products contain lead.

287.    Plaintiffs and Class members would not have purchased the Products had they known the truth about the lead in the Products.

288.    Plaintiffs and Class members have been directly and proximately injured by Defendant's conduct.

289.    Such injury includes, but is not limited to, the purchase price of the Products and/or the price of the Products at which they were offered.

290.    Moreover, Defendant's conduct is malicious, fraudulent, and/or wanton in that Defendant intentionally misled and withheld material information from consumers, including to increase the sale of the Products.

291.    Pursuant to California Civil Code § 1782(a), on or around October 29, 2025, Plaintiff on her own behalf, and on behalf of Class members, provided notice to Defendant of the alleged violations of the Consumer Legal Remedies Act by notice letter setting forth Plaintiff's claims.

292.    After receiving the notice, Defendant through their counsel informed Plaintiffs though their counsel that "if plaintiffs file suit in an Ohio federal court, it will not assert as a defense to any claim asserted by plaintiffs the fact that plaintiffs filed suit before any applicable 30-day statutory notice period expired'.

293.    Despite giving Defendant notice and opportunity to provide relief to the Plaintiffs and the Class Defendant has failed to provide any such relief. As such, Plaintiff seeks compensatory, monetary and punitive damages, and requests that this Court enter such Orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of such unfair business practices, and for such other relief as is provided in California Civil Code § 1780 and in the Prayer for Relief.

294. As a direct and proximate result of Defendant's unlawful conduct in violation of the CLRA, Plaintiffs and Class members request an Order pursuant to § 1780 enjoining such future wrongful conduct on the part of Defendant.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT
## Fla. Stat. § 501.201, *et seq.*
## (on behalf of Plaintiff Simmons and the Florida Subclass)

295. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

135. This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*, which states:

> Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

296. Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent the existence of lead in the Products. By misrepresenting the true contents of the Products, Defendant's marketing and labeling misleads a reasonable consumer.

297. Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

298. Defendant's misrepresentations and omissions were material because consumers are concerned with the safety of bodily products that they purchase, and the contents therein.

299. Defendant had exclusive knowledge of the lead levels in the Products and/or was in the best position to assess the lead levels in the Products before they were exposed to consumers.

300. Defendant made its untrue and/or misleading statement and representation willfully, wantonly, and with reckless disregard for the truth.

301. Defendant's advertising and products' labeling were intended to and did induce Plaintiffs and Class members to buy Defendant's Products.

302. In connection with consumer transactions (*i.e.*, the sale of the Products to consumers), Defendant committed unfair, deceptive, and/or unconscionable acts.

303. Plaintiffs and Class members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which—contrary to Defendant's representation—do not disclose the existence of lead in the Products.

304. Accordingly, Plaintiffs and Class members received less than what they bargained and/or paid for.

305. As a result of Defendant's recurring, unfair, deceptive, and unlawful acts and practices, Plaintiffs and Class members have suffered an ascertainable loss in an amount to be established at trial.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT**
**815 ILCS 505/1, *et seq.***
**(on behalf of Plaintiff Otkina and the Illinois Subclass)**

306. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

307. This cause of action is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, which states:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with

intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

308.    Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent the existence of lead in the Products. By misrepresenting the true contents of the Products, Defendant's marketing and labeling misleads a reasonable consumer.

309.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

310.    Defendant's misrepresentations and omissions were material because consumers are concerned with the safety of bodily products that they purchase, and the contents therein.

311.    Defendant had exclusive knowledge of the lead levels in the Products and/or was in the best position to assess the lead levels in the Products before they were exposed to consumers.

312.    Defendant made its untrue and/or misleading statement and representation willfully, wantonly, and with reckless disregard for the truth.

313.    Defendant's advertising and products' labeling were intended to and did induce Plaintiffs and Class members to buy Defendant's Products.

314.    In connection with consumer transactions (*i.e.*, the sale of the Products to consumers), Defendant committed unfair, deceptive, and/or unconscionable acts.

315.    Plaintiffs and Class members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which—contrary to Defendant's representation—do not disclose the existence of lead in the Products.

316. Accordingly, Plaintiffs and Class members received less than what they bargained and/or paid for.

317. As a result of Defendant's recurring, unfair, deceptive, and unlawful acts and practices, Plaintiffs and Class members have suffered an ascertainable loss in an amount to be established at trial.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT**
**Md. Com. Law Code § 13-101, *et seq.***
**(on behalf of Plaintiff Green and the Maryland Subclass)**

318. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

136. This cause of action is brought pursuant to the Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.*, which states:

> A person may not engage in any unfair, abusive, or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in: (1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services; [or] (2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services[.]

319. Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent the existence of lead in the Products. By misrepresenting the true contents of the Products, Defendant's marketing and labeling misleads a reasonable consumer.

320. Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

321. Defendant's misrepresentations and omissions were material because consumers are concerned with the safety of bodily products that they purchase, and the contents therein.

322. Defendant had exclusive knowledge of the lead levels in the Products and/or was in the best position to assess the lead levels in the Products before they were exposed to consumers.

323. Defendant made its untrue and/or misleading statement and representation willfully, wantonly, and with reckless disregard for the truth.

324. Defendant's advertising and products' labeling were intended to and did induce Plaintiffs and Class members to buy Defendant's Products.

325. In connection with consumer transactions (*i.e.*, the sale of the Products to consumers), Defendant committed unfair, deceptive, and/or unconscionable acts.

326. Plaintiffs and Class members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which—contrary to Defendant's representation—do not disclose the existence of lead in the Products.

327. Accordingly, Plaintiffs and Class members received less than what they bargained and/or paid for.

328. As a result of Defendant's recurring, unfair, deceptive, and unlawful acts and practices, Plaintiffs and Class members have suffered an ascertainable loss in an amount to be established at trial.

### FOURTH CAUSE OF ACTION
### VIOLATION OF THE MASSACHUSETTS CONSUMERS PROTECTION LAW
### Mass. Gen. L. Ch. 93A, *et seq.*
### (on behalf of Plaintiff Murray and the Massachusetts Subclass)

329. Plaintiff repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

137. This cause of action is brought pursuant to the Massachusetts Consumers Protection Law, Mass. Gen. L. Ch. 93A, *et seq.*, which states:

> Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

330. Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent the existence of lead in the Products. By misrepresenting the true contents of the Products, Defendant's marketing and labeling misleads a reasonable consumer.

331. Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

332. Defendant's misrepresentations and omissions were material because consumers are concerned with the safety of bodily products that they purchase, and the contents therein.

333. Defendant had exclusive knowledge of the lead levels in the Products and/or was in the best position to assess the lead levels in the Products before they were exposed to consumers.

334. Defendant made its untrue and/or misleading statement and representation willfully, wantonly, and with reckless disregard for the truth.

335. Defendant's advertising and products' labeling were intended to and did induce Plaintiff and Class members to buy Defendant's Products.

336. In connection with consumer transactions (*i.e.*, the sale of the Products to consumers), Defendant committed unfair, deceptive, and/or unconscionable acts.

337.    Plaintiff and Class members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which—contrary to Defendant's representation—do not disclose the existence of lead in the Products.

338.    Accordingly, Plaintiff and Class members received less than what they bargained and/or paid for.

339.    As a result of Defendant's recurring, unfair, deceptive, and unlawful acts and practices, Plaintiff and Class members have suffered an ascertainable loss in an amount to be established at trial.

## EIGHTH CAUSE OF ACTION
## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### Mich. Stat. § 445.901, *et seq.*
### (on behalf of Plaintiff Maya and the Michigan Subclass)

340.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

138.    This cause of action is brought pursuant to the Michigan Consumer Protection Act, Mich. Stat. § 445.901, *et seq.*, which states:

>       Unfair, unconscionable, or deceptive methods, acts, or practices in
>       the conduct of trade or commerce are unlawful.

341.    Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent the existence of lead in the Products. By misrepresenting the true contents of the Products, Defendant's marketing and labeling misleads a reasonable consumer.

342.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

343.     Defendant's misrepresentations and omissions were material because consumers are concerned with the safety of bodily products that they purchase, and the contents therein.

344.     Defendant had exclusive knowledge of the lead levels in the Products and/or was in the best position to assess the lead levels in the Products before they were exposed to consumers.

345.     Defendant made its untrue and/or misleading statement and representation willfully, wantonly, and with reckless disregard for the truth.

346.     Defendant's advertising and products' labeling were intended to and did induce Plaintiffs and Class members to buy Defendant's Products.

347.     In connection with consumer transactions (*i.e.*, the sale of the Products to consumers), Defendant committed unfair, deceptive, and/or unconscionable acts.

348.     Plaintiffs and Class members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which—contrary to Defendant's representation—do not disclose the existence of lead in the Products.

349.     Accordingly, Plaintiffs and Class members received less than what they bargained and/or paid for.

350.     As a result of Defendant's recurring, unfair, deceptive, and unlawful acts and practices, Plaintiffs and Class members have suffered an ascertainable loss in an amount to be established at trial.

### NINTH CAUSE OF ACTION
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
### Mo. Rev. Stat. Ch. 407, *et seq.*
### (on behalf of Plaintiff Vescovo and the Missouri Subclass)

351.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

139. This cause of action is brought pursuant to the Missouri Merchandising Practices Act, Revised Statutes of Missouri, Chapter 407, *et seq.*, which states:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . , in or from the state of Missouri, is declared to be an unlawful practice . . . . Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

352. Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent the existence of lead in the Products. By misrepresenting the true contents of the Products, Defendant's marketing and labeling misleads a reasonable consumer.

353. Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

354. Defendant's misrepresentations and omissions were material because consumers are concerned with the safety of bodily products that they purchase, and the contents therein.

355. Defendant had exclusive knowledge of the lead levels in the Products and/or was in the best position to assess the lead levels in the Products before they were exposed to consumers.

356. Defendant made its untrue and/or misleading statement and representation willfully, wantonly, and with reckless disregard for the truth.

357. Defendant's advertising and products' labeling were intended to and did induce Plaintiffs and Class members to buy Defendant's Products.

358.     In connection with consumer transactions (*i.e.*, the sale of the Products to consumers), Defendant committed unfair, deceptive, and/or unconscionable acts.

359.     Plaintiffs and Class members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which—contrary to Defendant's representation—do not disclose the existence of lead in the Products.

360.     Accordingly, Plaintiffs and Class members received less than what they bargained and/or paid for.

361.     As a result of Defendant's recurring, unfair, deceptive, and unlawful acts and practices, Plaintiffs and Class members have suffered an ascertainable loss in an amount to be established at trial.

<u>**TENTH CAUSE OF ACTION**</u>
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. Ann. § 56:8-1, *et seq.***
**(on behalf of Plaintiff Habboush and the New Jersey Subclass)**

362.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

140.     This cause of action is brought pursuant to the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*, which states:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

363.     Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent the existence of lead

in the Products. By misrepresenting the true contents of the Products, Defendant's marketing and labeling misleads a reasonable consumer.

364.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

365.    Defendant's misrepresentations and omissions were material because consumers are concerned with the safety of bodily products that they purchase, and the contents therein.

366.    Defendant had exclusive knowledge of the lead levels in the Products and/or was in the best position to assess the lead levels in the Products before they were exposed to consumers.

367.    Defendant made its untrue and/or misleading statement and representation willfully, wantonly, and with reckless disregard for the truth.

368.    Defendant's advertising and products' labeling were intended to and did induce Plaintiffs and Class members to buy Defendant's Products.

369.    In connection with consumer transactions (*i.e.*, the sale of the Products to consumers), Defendant committed unfair, deceptive, and/or unconscionable acts.

370.    Plaintiffs and Class members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which—contrary to Defendant's representation—do not disclose the existence of lead in the Products.

371.    Accordingly, Plaintiffs and Class members received less than what they bargained and/or paid for.

372.    As a result of Defendant's recurring, unfair, deceptive, and unlawful acts and practices, Plaintiffs and Class members have suffered an ascertainable loss in an amount to be established at trial.

## ELEVENTH CAUSE OF ACTION
### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### N.Y. Gen. Bus. Law § 350, *et seq.*
### (on behalf of Plaintiff Mitchem and the New York Subclass)

373. Plaintiff repeats and realleges each and every allegation contained in all the foregoing paragraphs as if fully set forth herein.

374. N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

375. N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representation made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual.

376. Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's Products inasmuch as they misrepresent the existence of lead in the Products. By misrepresenting the true contents of the Products, Defendant's marketing and labeling misleads a reasonable consumer.

377. Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

378. Defendant's misrepresentations and omissions were material because consumers are concerned with the safety of bodily products that they purchase, and the contents therein.

379.   Defendant had exclusive knowledge of the lead levels in the Products and/or was in the best position to assess the lead levels in the Products before they were exposed to consumers.

380.   Defendant made its untrue and/or misleading statement and representation willfully, wantonly, and with reckless disregard for the truth.

381.   Defendant's advertising and products' labeling were intended to and did induce Plaintiffs and Class members to buy Defendant's Products.

382.   In connection with consumer transactions (*i.e.*, the sale of the Products to consumers), Defendant committed unfair, deceptive, and/or unconscionable acts.

383.   Plaintiffs and Class members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which—contrary to Defendant's representation—do not disclose the existence of lead in the Products.

384.   Accordingly, Plaintiffs and Class members received less than what they bargained and/or paid for.

385.   As a result of Defendant's recurring, unfair, deceptive, and unlawful acts and practices, Plaintiffs and Class members are entitled to monetary, statutory damages of $500 per unit sold, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**(on behalf of Plaintiffs and the Class)**

386.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

387.   Defendant is a merchant and was at all relevant times involved in the manufacturing, distributing, and/or selling of the Products.

388.    The Products are considered a "good" under the relevant laws.

389.    UCC section 2-314 provides that for goods to be merchantable must (a) pass without objection in the trade under the contract description; (b) in the case of fungible goods, are of fair average quality within the description; (c) are fit for the ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved.

390.    Defendant breached the implied warranty of merchantability because the Products have lead. The lead is an exponentially higher levels than other tampon products.

391.    Menstrual health products are not expected to have lead, let alone the levels of lead Plaintiffs' independent testing revealed in Defendant's Products.

392.    Defendant has been provided sufficient notice of its breaches of implied warranties associated with the Product. Defendant was put on constructive notice of its breach through an academic publication, as alleged herein, and upon information and belief through its own product testing and records, as well as notice letters from litigants and lawsuits filed since July of 2024. In particular, Plaintiff on her own behalf, and on behalf of Class members, on or around October 29, 2025 provided notice to Defendant of the alleged breach of implied warranties by notice letter setting forth Plaintiff's claims.

393.    After receiving the notice, Defendant through their counsel informed Plaintiffs though their counsel that "that if plaintiffs file suit in an Ohio federal court, it will not assert as a defense to any claim asserted by plaintiffs the fact that plaintiffs filed suit before any applicable 30-day statutory notice period expired".

394.    Despite giving Defendant notice and opportunity to provide relief to the Plaintiffs and the Class for breach of the implied warranties, Defendant has failed to provide any such relief.

As such, Plaintiff seeks compensatory, monetary and punitive damages, and requests that this Court enter such Orders or judgments as may be necessary to restore to any person in interest any money which may have been acquired by means of the breach of implied warranties.

395. Plaintiffs and each of the Class members were injured because the Products contained Lead. Defendant thereby breached the following state warranty laws:

       a.       Code of Ala. § 7-2-314;

       b.       Alaska Stat. § 45.02.314;

       c.       A.R.S. § 47-2314;

       d.       A.C.A. § 4-2-314;

       e.       Cal. Comm. Code § 2314;

       f.       Colo. Rev. Stat. § 4-2-314;

       g.       Conn. Gen. Stat. § 42a-2-314;

       h.       6 Del. C. § 2-314;

       i.       D.C. Code § 28:2-314;

       j.       Fla. Stat. § 672.314;

       k.       O.C.G.A. § 11-2-314;

       l.       H.R.S. § 490:2-314;

       m.       Idaho Code § 28-2-314;

       n.       810 I.L.C.S. 5/2-314;

       o.       Ind. Code § 26-1-2-314;

       p.       Iowa Code § 554.2314;

       q.       K.S.A. § 84-2-314;

       r.       K.R.S. § 355.2-313;

s.      11 M.R.S. § 2-314;

t.      Md. Commercial Law Code Ann. § 2-314;

u.      106 Mass. Gen. Laws Ann. § 2-314;

v.      M.C.L.S. § 440.2314;

w.      Minn. Stat. § 336.2-314;

x.      Miss. Code Ann. § 75-2-314;

y.      R.S. Mo. § 400.2-314;

z.      Mont. Code Anno. § 30-2-314;

aa.      Neb. Rev. Stat. § 2-314;

bb.      Nev. Rev. Stat. Ann. § 104.2314;

cc.      R.S.A. 382-A:2-314;

dd.      N.J. Stat. Ann. § 12A:2-314;

ee.      N.M. Stat. Ann. § 55-2-314;

ff.      N.Y. U.C.C. Law § 2-314;

gg.      N.C. Gen. Stat. § 25-2-314;

hh.      N.D. Cent. Code § 41-02-31;

ii.      O.R.C. Ann. § 1302.27;

jj.      12A Okl. St. § 2-314;

kk.      Or. Rev. Stat. § 72-3140;

ll.      13 Pa. Rev. Stat. § 72-3140;

mm.      R.I. Gen. Laws § 6A-2-314;

nn.      S.C. Code Ann. § 36-2-314;

oo.      S.D. Codified Laws, § 57A-2-314;

pp.    Tenn. Code Ann. § 47-2-314;

qq.    Tex. Bus. & Com. Code § 2.314;

rr.    Utah Code Ann. § 70A-2-314;

ss.    9A V.S.A. § 2-314;

tt.    Va. Code Ann. § 8.2-314;

uu.    Wash. Rev. Code Ann. § 6A.2-314;

vv.    W. Va. Code § 46-2-314;

ww.    Wis. Stat. § 402.314; and

xx.    Wyo. Stat. § 34.1-2-314.

396.    As a direct and proximate result of Defendant's breach of the implied warranty, Plaintiffs and Class members were damaged in the amount of the price they paid for the Products, in an amount to be proven at trial.

**THIRTEENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(on behalf of Plaintiffs and the Class in the alternative)**

397.    Plaintiffs repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

398.    Plaintiffs, on behalf of themselves and consumers nationwide, bring a claim for unjust enrichment.

399.    Defendant's conduct violated, inter alia, state and federal law by manufacturing, advertising, marketing, and selling its Products while misrepresenting and omitting material facts.

400.    Defendant's unlawful conduct as described in this Complaint allowed Defendant to knowingly realize substantial revenues from selling its Products at the expense of, and to the detriment or impoverishment of, Plaintiffs and Class members, and to Defendant's benefit and

enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

401.     Plaintiffs and Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

402.     Defendant retaining the benefits conferred by Plaintiffs and Class members' overpayments would be inequitable.

403.     Plaintiffs and Class members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

a.     Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as the Class Representatives and appointing the undersigned counsel as Class Counsel;

b.     Awarding monetary damages and treble damages as the law permits;

c.     Awarding punitive damages as the law permits;

d.     Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the Class members as a result of Defendant's unlawful, unfair and fraudulent business practices;

e.     Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein;

      f.      Awarding Plaintiffs and Class members its costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys and experts, and reimbursement of Plaintiffs' expenses;

      g.      Ordering Defendant to pay pre- and post-judgment interest on any amounts awarded; and

      h.      Granting such other and further relief as the Court may deem just and proper.

Dated: November 19, 2025

Respectfully submitted,

s/*Frank Bartela*

| | |
|---|---|
| Joseph C. Kohn (Pro Hac Vice to be filed) | Frank A. Bartela (#0088128) |
| Aarthi Manohar (Pro Hac Vice to be filed) | Nicole T. Fiorelli (#0079204) |
| **KOHN, SWIFT & GRAF, P.C.** | Patrick J. Brickman (Seeking Admission to |
| 1600 Market Street, Suite 2500 | S.D. of Ohio) |
| Philadelphia, PA 19103 | **DWORKEN & BERNSTEIN CO., LPA** |
| Tel: (215) 238-1700 | 1468 W. 9th Street, Suite 135 |
| jkohn@kohnswift.com | Cleveland, OH 44113 |
| amanohar@kohnswift.com | Tel: (866) 985-3323 |
| | fbartela@dworkenlaw.com |
| | nfiorelli@dworkenlaw.com |
| Daniel C. Levin (Pro Hac Vice to be filed) | pbrickman@dworkenlaw.com |
| Charles E. Schaffer (Pro Hac Vice to be filed) | |
| Nicholas J. Elia (Pro Hac Vice to be filed) | D. Aaron Rihn (Pro Hac Vice to be filed) |
| **LEVIN SEDRAN & BERMAN LLP** | Sara Watkins (Pro Hac Vice to be filed) |
| 510 Walnut Street, Suite 500 | **ROBERT PEIRCE & ASSOCIATES, P.C.** |
| Philadelphia, PA 19106 | 707 Grant Street, Suite 125 |
| Tel: (215) 592-1500 | Pittsburgh, PA 15219 |
| Fax: (215) 592-4663 | Tel: (844) 383-0565 |
| dlevin@lfsblaw.com | arihn@peircelaw.com |
| cschaffer@lfsblaw.com | swatkins@peircelaw.com |
| nelia@lfsblaw.com | |